# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:19-CV-** |
| | ) | |
| **v.** | ) | **Judges _____** |
| | ) | |
| **REAL PROPERTIES LOCATED AT** | ) | |
| | ) | |
| **617 SHANNON AVENUE** | ) | |
| **CHATTANOOGA, TENNESSEE 37411** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **508 MENLO STREET** | ) | |
| **CHATTANOOGA, TENNESSEE 37411** | ) | |
| | ) | |
| **Defendants.** | ) | |

## VERIFIED COMPLAINT *IN REM*

Comes now the plaintiff, United States of America, by and through its attorneys, J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Gretchen Mohr, Assistant United States Attorney, and brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

## NATURE OF THE ACTION

1.      In this *in rem* civil action, the United States of America seeks forfeiture of the real properties listed below:

    a)  617 Shannon Avenue, Chattanooga, Tennessee 37411; and

    b)  508 Menlo Street, Chattanooga, Tennessee 37411

(hereinafter "defendant properties").

## THE DEFENDANT *IN REM*

2.      The United States seeks forfeiture of the following defendant properties, with all appurtenances, improvements, and attachments thereon, which are more fully identified and more particularly described below:

a)  617 Shannon Avenue, Chattanooga, Tennessee 37411

The following described real estate in the City of Chattanooga, Hamilton County, Tennessee:

Lots Twenty-nine (29) and Thirty (30), Block One (1), Carson Heights Additions, as shown by plat of record in Plat Book 8, page 26 in the Register's Office of Hamilton County, Tennessee. According to said plat, said lots together form one (1) tract of ground which fronts one hundred five and 95/100 (105.95) feet on the Northeastern line of Shannon Avenue and extends Northeastwardly, between practically parallel lines, to the Southwestern line of a ten (10) foot alley, upon which it has a footage of one hundred five and 21/100 (105.21) feet: its Northwestern line being the dividing line between Lots Twenty-eight (28) and Twenty-nine (29) of said Addition, is one hundred fifty-three and 2/10 (153.2) feet in length and its Southeastern line being the dividing line between Lots Thirty-one (31) and Thirty (30) of said Addition, is one hundred forty-six and 26/100 (146.26) feet in length.

For prior title see Quitclaim Deed recorded March 31, 1978 in Book 2500, page 110, in the Register's Office of Hamilton County, Tennessee.

Subject to any and all matters as shown on Plat Book 8, page 26 in the Register's Office of Hamilton County, Tennessee.

Property taxes and assessments for the year 2016 and thereafter will be paid by the Grantees named herein.

For further reference see Warranty Deed filed and recorded on July 29, 2016, in Deed Book GI 10810, Page 749, in the Register's Office of Hamilton County, Tennessee, Instrument Number 2016072900094.

b) 508 Menlo Street Chattanooga, Tennessee 37411

IN THE CITY OF CHATTANOOGA, HAMILTON COUNTY, TENNESSEE:

Lot Five (5), Ridge Garden Addition, as shown by plat of record in Plat Book 7, Page 8, in the Register's Office of Hamilton County, Tennessee. FOR PRIOR TITLE, see Deed from Ester Buford (Hood) to Eva Buford Brown, dated June 27, 1990, and recorded on July 9, 1990 in Book 3748, Page 233, See Also Deed in Book 1763, Page 126, in the Register's Office of Hamilton County, Tennessee.

THIS CONVEYANCE MADE SUBJECT TO THE FOLLOWING:

Any governmental zoning and subdivision ordinances in effect thereon.

All notes, stipulations, restrictions, easements, conditions, and regulations as shown, described or noted on recorded plat.

Conditions, restrictions, reservations, limitations, easements, any lien rights, etc., as set out in instrument recorded in Book Y, Volume 9, Page 602, in Book A, Volume 10, Page 84, and in Book E, Volume 10, Page 126, in the Register's Office of Hamilton County, Tennessee, but omitting any covenant or restriction based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that said covenant (a) is exempt under Chapter 42, Section 3607, of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons.

Conditions and easements contained in document of record in Book 2116, Page 186, in the Register's Office of Hamilton County, Tennessee.

For further reference see Warranty Deed filed and recorded on November 18, 2016, in Deed Book GI 10909, Page 613, in the Register's Office of Hamilton County, Tennessee, Instrument Number 2016111800122.

3.      The defendant properties have not been seized but are within the jurisdiction of the Court pursuant to 28 U.S.C. § 1355(b)(1)(A). The United States does not request authority from the Court to seize the defendant properties at this time. The United States will, as provided by 18 U.S.C. §§ 985(b)(2) and (c)(1):

a)  post notice of this action and a copy of the Complaint on the defendant properties;

b)  serve notice of this action on the record owner of the defendant properties, and any other person or entity who may claim an interest in the defendant properties, along with a copy of this Complaint;

c)  execute a writ of entry for purposes of conducting an inspection and inventory of the defendant property; and

d)  file a notice of *lis pendens* in the county records where the defendant properties is located.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant properties.  This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5.      This Court has *in rem* jurisdiction over the defendant properties pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture of the defendant properties occurred in this district.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395(b) because the defendant properties are located in this district.

## BASIS FOR FORFEITURE

4.      The United States of America seeks forfeiture of the defendant property pursuant to the following:

a)  21 U.S.C. § 881(a)(6), which authorizes forfeiture of all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act, in violation of 21 U.S.C. §§ 841 and/or 846;

b) 21 U.S.C. § 881(a)(7), which authorizes forfeiture of any property, real or personal, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of a violation of 21 U.S.C. § 846, and/or 841;

c) 18 U.S.C. § 981(a)(1)(A), which authorizes forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation 18 U.S.C. §§ 1956 and/or 1957, or any property traceable to such property; and

d) 18 U.S.C. § 981(a)(1)(C), which authorizes forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense.

5.      Pursuant to 21 U.S.C. § 881(h), all right, title and interest in the defendant properties became vested in the United States at the time of the acts giving rise to the forfeiture.

## FACTS

6.      As set forth in detail in the Affidavit of Special Agent, William C. Wise, Drug Enforcement Administration, the Government's investigation has determined that the defendant properties constitute facilitating property and/or proceeds traceable to violations of 21 U.S.C. §§ 841 and/or 846 and were derived from proceeds traceable to and involved in violations of 18 U.S.C. §§ 1956 and/or 1957.  The owner of the defendant properties, Jamaal Parker, also known as "MAAL," also known as "MONEYMAAL," and other co-conspirators, were engaged in the distribution of cocaine that operates in Tennessee, and were laundering drug proceeds in order to hide and disguise these proceeds from law enforcement officials and to promote and facilitate their drug trafficking activities.

7.      The defendant properties, therefore, are subject to forfeiture pursuant to 21 U.S.C. §§ 881(a)(6), 881(a)(7), 18 U.S.C. §§ 981(a)(1)(A), and 981(a)(1)(C).

## CLAIM FOR RELIEF

8.      Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 10 above.

## PRAYER FOR RELIEF

Wherefore, the United States of America prays:

a)      Defendant properties be condemned and forfeited to the United States of America in accordance with the provisions of law;

b)      Notice of this action be given to all persons known or thought to have an interest in or right against the defendant properties;

c)      Plaintiff be awarded its costs in this action and for such other necessary and equitable relief as this Court deems proper.

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney

By:     *s/Gretchen Mohr*
GRETCHEN MOHR
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee  37902
(865) 545-4167

## <u>VERIFICATION</u>

I, William C. Wise, Special Agent, Drug Enforcement Administration, hereby verify and declare under penalty of perjury as provided by 28 U.S.C. § 1746, the following:

That I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint *In Rem* and in the accompanying Affidavit are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are from information gathered by law enforcement officers, as well as my investigation of this case with the Drug Enforcement Administration.

I hereby verify and declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this ___13th___ day of May, 2019.

*William C. Wise*
William C. Wise
Special Agent
Drug Enforcement Administration

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gretchen Mohr, AUSA, 800 Market St., Suite 211
Knoxville, Tennessee 37902, (865) 545-4167

## DEFENDANTS

617 Shannon Avenue, Chattanooga, TN 37411, and
508 Menlo Street, Chattanooga, TN 37411

County of Residence of First Listed Defendant    Hamilton County, Tennesse
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government
     Plaintiff

☐ 2 U.S. Government
     Defendant

☐ 3 Federal Question
     *(U.S. Government Not a Party)*

☐ 4 Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | |    28 USC 157 |    3729(a)) |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |    Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|    Student Loans | ☐ 340 Marine |    Injury Product | |    New Drug Application | ☐ 470 Racketeer Influenced and |
|    (Excludes Veterans) | ☐ 345 Marine Product |    Liability | | ☐ 840 Trademark |    Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending |    Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract |    Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Property Damage |    Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - |    Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| |    Medical Malpractice | |    Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |    Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |    Income Security Act |    or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party |    Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |    Sentence | |    26 USC 7609 |    Agency Decision |
| ☐ 245 Tort Product Liability |    Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | |    State Statutes |
| |    Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other | ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation -
     Transfer

☐ 8 Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) and 21 U.S.C. §§ 881(a)(6) and 881(a)(7)

Brief description of cause: Forfeiture of real properties that constitute facilitating property and/or proceeds traceable to 21 U.S.C.
§§ 841 and/or 846 and 18 U.S.C. §§ 1956 and/or 1957

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE    Travis R. McDonough

DOCKET NUMBER    1:19-cr-46

DATE
05/21/2019

SIGNATURE OF ATTORNEY OF RECORD
s/ Gretchen Mohr

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

## AFFIDAVIT IN SUPPORT OF VERIFIED COMPLAINT *IN REM*

I, William C. Wise, Drug Enforcement Administration, ("DEA') Special Agent, being duly sworn, depose and state as follows:

### Professional Training and Experience of Affiant

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice. I have been so employed for the past 20 years. I am currently assigned to the Chattanooga Resident Office. Prior to my current assignment, I was assigned to the Chiang Mai Resident Office, Honolulu District Office, and the Chicago Field Division. Prior to my employment with the DEA, I was employed as an Arlington County Police Officer for approximately 5 years and 6 months in Arlington, Virginia.

3.      In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848. I have also been involved in various types of wire and electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking for the past 19 years. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers, including four months of DEA basic training in Quantico, Virginia as well as periodic refresher training offered by the DEA. My current

1

assignment involves investigations of high-level drug trafficking organizations in east Tennessee, north Georgia, and elsewhere.

4.      I have experience in the execution of documentary search warrants, the debriefing of defendants, witnesses, informants and other persons who have knowledge of the amassing, spending, converting, transporting, distributing, laundering and concealing the proceeds of illegal activities.  In connection with my official duties as a Federal Law Enforcement Officer, I have been assigned or assisted with investigations involving drug trafficking and money laundering in violation of Titles 18 and Title 21 United States Code.   The investigations in which I have participated have resulted in the arrest, prosecution and conviction of individuals who have committed these crimes.

5.      I know, based on my training and experience, that persons engaged in drug trafficking and money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records.  Records of this kind are also often stored on computer media.

6.      I know that money launderers and narcotics traffickers attempt to conceal themselves from law enforcement by attempting to distance themselves from their criminal activity.  This is performed by utilizing fictitious or nominee names to account for their assets and accretion of wealth.  Often the money launderers and narcotics traffickers will utilize these other identities to register automobiles, boats, houses, telephone services, utility services, etc. in order to further secret their participation in criminal activity.  Another method used by leaders within a criminal enterprise to remain unnoticed by law enforcement is the utilization of other

2

individuals within their organization to perform specific acts in furtherance of the criminal activity, for example performing financial transactions utilizing the proceeds of their illegal activity or the purchase, sale and distribution of narcotics.   In addition to concealing their identities, it is common for money launderers and narcotics traffickers to frequently change their forms of communication and methods of operation to avoid detection by law enforcement.

7.     Based upon my training and experience with money laundering and criminal investigations, combined with the knowledge and information concerning, controlled substances, and investigations thereof provided by other law enforcement officers, I know that:

a.     Drug dealers usually keep controlled substances and paraphernalia for packaging, cutting, weighing, transporting, and distributing controlled substances at places under their control, such as their residences, or in the control of their trusted associates.  Drug paraphernalia is typically in close proximity to the locations of the controlled substances themselves.

b.     Persons involved in drug distribution and its related money laundering activities acquire and maintain records related to drug distribution and records relating to the acquisition and disposition of drug proceeds.  Drug traffickers commonly create and maintain books, records, receipts, notes, ledgers, and documents reflecting the names, nicknames, addresses, telephone and pager and other contact numbers of their drug trafficking conspirators, including their sources of supply and their customers.  These records typically document the following:

i.   amounts of money owed and amounts of drugs purchased by customers, as well as amounts of money owed to and amounts of drugs purchased from sources of supply;

3

ii.  transportation to acquire and to sell drugs;

iii.  the purchase of drugs, drug packaging supplies, drug paraphernalia, and other assets used to facilitate the acquisition and sale of drugs; and

iv.  the location of storage facilities and other stash locations to store drugs.

c.  Drug traffickers commonly profit and amass proceeds from their illicit activity.  In order to protect their illegal activity and be able to utilize the profits, they attempt to disguise and legitimize these profits through money laundering activities.

d.  Drug traffickers often purchase and/or title assets bought with illegal proceeds in fictitious names, aliases, names of relatives, associates, or business entities, who serve as "nominee" title holders while the criminals actually own and continue to use the assets and exercise dominion and control over the assets.

e.  Drug traffickers often engage in legitimate businesses as a "front" to launder drug proceeds.  The business front provides a means for the criminal to show that he/she has legitimate income, when, in fact, the income is solely from the criminal activity.  Records of such legitimate businesses funded by the proceeds of illegal activity constitute relevant evidence of money laundering offenses.

f.  Drug traffickers maintain records pertaining to their acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, home furnishings, stocks, bonds, precious metals and gemstones, jewelry, electronic equipment and other assets in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements,

4

letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers.

g.    Drug traffickers and their associates are known to use aliases, fictitious and multiple addresses, and multiple drivers' licenses, as well as maintain records of the same, in order to conceal their true identity and hinder law enforcement investigation of their illegal activity.

h.    Drug traffickers often obtain lines of credit, loans, or mortgages to purchase assets in which they have low equity interest to avoid seizure and forfeiture attempts by law enforcement authorities.

i.    Drug traffickers primarily utilize U.S. currency as the method of conducting their illegal activity.  Therefore, drug traffickers often maintain on hand and have quick access to large amounts of U.S. currency or other liquid assets in order to maintain and finance their ongoing criminal business.

j.    Drug traffickers often utilize electronic equipment such as computers, smartphones, tablet computers, currency counting machines, and telephone answering machines to generate, transfer, count, record, and/or store the information described in the preceding paragraphs.

k.    Drug traffickers often use telephones to facilitate their drug activities. Records of such telephone calls, including telephone bills, are commonly kept and maintained by the drug traffickers.

l.    Drug traffickers often take or cause to be taken photographs or video movies of themselves, their associates, their property and assets, and their product.

m. Drug traffickers commonly maintain firearms, such as handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. These weapons are used to protect and secure their property, drugs, and cash stores from thieves, as drug traffickers are often the victims of robberies and "rip-offs" during a drug or other illegal transaction. Because firearms are in demand by drug dealers, such items are often bartered for drugs or other contraband. Indeed, the law has long recognized that the presence of firearms is relevant and probative of drug crimes, as such are tools of the trade of drug traffickers.

8. Except as noted herein, all of the information contained in this affidavit is either known to me personally or has been told to me by other law enforcement officers, to include investigative reports by other officers.

### Court Authorized Title III Interceptions

9. On January 8, 2019, a federal application and order to intercept the wire and electronic communications of Jerriod SIVELS over (423) 680-0530 (Target Telephone #1) and (615) 491-2638 (Target Telephone #2) was signed by the Honorable Judge Harry S. Mattice, Jr., United States District Judge, Eastern District of Tennessee. On February 6, 2019, the Honorable Judge Harry S. Mattice, Jr., signed an order authorizing the continued interception of Target Telephone #1 and Target Telephone #2. Interceptions occurred between January 8, 2019 and March 4, 2019.

10. On January 18, 2019, a federal application and order to intercept the wire and electronic communications of Jerriod SIVELS over (423) 708-0796 (Target Telephone #4) was signed by the Honorable Judge Harry S. Mattice, Jr., United States District Judge, EasternDistrict of Tennessee. Interceptions occurred between January 18, 2019 and February 15, 2019.

6

11.     On February 19, 2019, a federal application and order to intercept the wire

communications of Jamaal PARKER over (423) 383-6915 (hereinafter referred to as Target

Telephone #3) was signed by the Honorable Judge Harry S. Mattice, Jr., United States District

Judge, Eastern District of Tennessee.  Interceptions occurred between February 19, 2019 and

March 4, 2019.

## Properties for Forfeiture

12.     This affidavit supports the civil forfeiture of real property, with all appurtenances,

improvements, and attachments thereon, located at 508 Menlo Street, Chattanooga, Tennessee

37411 ("Menlo Property") and described as follows:

> IN THE CITY OF CHATTANOOGA, HAMILTON COUNTY,
> TENNESSEE:
>
> Lot Five (5), Ridge Garden Addition, as shown by plat of record in Plat Book
> 7, Page 8, in the Register's Office of Hamilton County, Tennessee.
> FOR PRIOR TITLE, see Deed from Ester Buford (Hood) to Eva Buford
> Brown, dated June 27, 1990, and recorded on July 9, 1990 in Book 3748, Page
> 233, See Also Deed in Book 1763, Page 126, in the Register's Office of
> Hamilton County, Tennessee.
>
> THIS CONVEYANCE MADE SUBJECT TO THE FOLLOWING:
>
> Any governmental zoning and subdivision ordinances in effect thereon.
>
> All notes, stipulations, restrictions, easements, conditions, and regulations as
> shown, described or noted on recorded plat.
>
> Conditions, restrictions, reservations, limitations, easements, any lien rights,
> etc., as set out in instrument recorded in Book Y, Volume 9, Page 602, in Book
> A, Volume 10, Page 84, and in Book E, Volume 10, Page 126, in the Register's
> Office of Hamilton County, Tennessee, but omitting any covenant or
> restriction based on race, color, religion, sex, handicap, familial status or
> national origin unless and only to the extent that said covenant (a) is exempt
> under Chapter 42, Section 3607, of the United States Code or (b) relates to
> handicap but does not discriminate against handicapped  persons.
>
> Conditions and easements contained in document of record in Book 2116, Page
> 186, in the Register's Office of Hamilton County, Tennessee.

7

For further reference see Warranty Deed filed and recorded on November 18, 2016, in Deed Book GI 10909, Page 613, in the Register's Office of Hamilton County, Tennessee, Instrument Number 2016111800122.

13.     This affidavit also supports the civil forfeiture of real property, with all appurtenances, improvements, and attachments thereon, located at 617 Shannon Avenue, Chattanooga, Tennessee 37411 ("Shannon Property") and described as follows:

The following described real estate in the City of Chattanooga, Hamilton County, Tennessee:

Lots Twenty-nine (29) and Thirty (30), Block One (1), Carson Heights Additions, as shown by plat of record in Plat Book 8, page 26 in the Register's Office of Hamilton County, Tennessee.  According to said plat, said lots together form one (1) tract of ground which fronts one hundred five and 95/100 (105.95) feet on the Northeastern line of Shannon Avenue and extends Northeastwardly, between practically parallel lines, to the Southwestern line of a ten (10) foot alley, upon which it has a footage of one hundred five and 21/100 (105.21) feet: its Northwestern line being the dividing line between Lots Twenty-eight (28) and Twenty-nine (29) of said Addition, is one hundred fifty-three and 2/10 (153.2) feet in length and its Southeastern line being the dividing line between Lots Thirty-one (31) and Thirty (30) of said Addition, is one hundred forty-six and 26/100 (146.26) feet in length.

For prior title see Quitclaim Deed recorded March 31, 1978 in Book 2500, page 110, in the Register's Office of Hamilton County, Tennessee.

Subject to any and all matters as shown on Plat Book 8, page 26 in the Register's Office of Hamilton County, Tennessee.

Property taxes and assessments for the year 2016 and thereafter will be paid by the Grantees named herein.

For further reference see Warranty Deed filed and recorded on July 29, 2016, in Deed Book GI 10810, Page 749, in the Register's Office of Hamilton County, Tennessee, Instrument Number 2016072900094.

14.     Based on the information developed throughout this investigation and set out in this affidavit, I believe that the Menlo Property and Shannon Property constitute proceeds traceable to violations of 21 U.S.C. §§ 841 (Drug Distribution) and/or 846 (Drug Conspiracy)

and are subject to civil forfeiture pursuant to 21 U.S.C. §§881(a)(6) and 881(a)(7), and pursuant to 18 U.S.C. §§ 1956 and/or 1957 (Money Laundering) and are subject to civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

<u>**Drug Investigation Background**</u>

15.     Since approximately 2014, the ATF, Chattanooga Police Department, and other federal, state, and local law enforcement agencies began conducting an investigation into Jamaal PARKER.  In August 2018, the DEA, ATF, Chattanooga Police Department, and other federal, state, and local law enforcement agencies initiated an investigation into JERRIOD SIVELS, also known as "JERRIOD LEE," also known as "JERRIOD SIVELS-LEE," also known as "JERRY," also known as "LIL JERRY," also known as "BRMG JAY," JAMAAL PARKER, also known as "MAAL," also known as "MONEYMAAL," and other co-conspirators who are engaged in the distribution of cocaine, marijuana, and other narcotics in Tennessee, Georgia, and elsewhere. The investigation to date has revealed that PARKER and SIVELS are leaders within this DTO. Jamaal PARKER and Jerriod SIVELS control the sale and distribution of cocaine and marijuana in the Eastern District of Tennessee (EDTN) and distribution of cocaine and marijuana to subordinates in this DTO.

16.     During the course of this investigation, DEA and other law enforcement agencies have obtained information regarding PARKER and SIVELS DTO from several cooperating sources to include Confidential Source One, hereinafter "CS-1,"  Confidential Source Two, hereinafter, "CS-2", and Confidential Source Three, hereinafter "CS-3."

17.     Between 2014 and 2016, CS-1 has been interviewed in-person and over the telephone by Chattanooga Police Department detectives and ATF on numerous occasions regarding Jamaal PARKER.  A substantial portion of the information provided by CS-1 has been

corroborated by independent investigation, including physical surveillance, the review of DEA and ATF documents as well as other federal, state, and local documents, and interviews of other members of the above-stated drug trafficking organization. In 2014, CS-1 provided the following information regarding the PARKER ORGANIZATION. CS-1 identified Martrel ARNOLD, aka "Tricky Trel," as the leader of the Athens Park Bloods street gang in Chattanooga, Tennessee. CS-1 stated that ARNOLD was involved in distributing kilogram quantities of cocaine. Jamaal PARKER was identified as a cocaine source of supply to ARNOLD, Jerriod SIVELS, and Ricky HALFACRE.

18. Between August 2015 and January 2019, CS-2 has been interviewed in-person and over the telephone by agents of ATF on numerous occasions. A substantial portion of the information provided by CS-2 has been corroborated by independent investigation, including physical surveillance, the review of DEA and ATF documents as well as other federal, state, and local documents, and interviews of other members of the above-stated drug trafficking organization. CS-2 identified Jamaal PARKER as a multi-kilogram distributor of cocaine in the Chattanooga, Tennessee area. CS-2 related that Jamaal PARKER was assisted in his drug distribution by several lower level distributors. CS-2 believed Jamaal PARKER's source of supply to be in the Atlanta, Georgia area.

19. CS-3 has made multiple controlled purchases of cocaine from SIVELS as detailed below. Additionally, CS-3 was present for numerous calls and text messages wherein SIVELS discussed and facilitated drug trafficking.

20. On July 11, 2016, ATF conducted a consensual interview with Cooperating Defendant One (hereinafter referred to as CD-1) subsequent to his state arrest on narcotic charges a few days prior. A substantial portion of CD-1's information has been corroborated by

10

independent investigation, including interviews of other sources, surveillance, and controlled purchases of narcotics. During the interview, CD-1 identified Michael JACKSON as a distributor of heroin and crack cocaine in Chattanooga, Tennessee. JACKSON's source of supply was named as Jamaal PARKER. CD-1 stated that JACKSON would purchase between two and nine ounces of cocaine from Jamaal PARKER at a time.

21.     In April 2017, agents of the ATF met with CS-2 and formulated plans to make a controlled purchase of cocaine from Jamaal PARKER. At that time, CS-2 advised agents that CS-2 had spoken to PARKER earlier and that PARKER had agreed to sell cocaine to CS-2. CS-2 was then searched for contraband with negative results. CS-2 was then provided with ATF funds for the purchase of cocaine and monitoring/recording equipment. CS-2 departed the pre-buy location and was followed by surveillance to a store in Chattanooga, Tennessee. Upon arrival to the store, CS-2 exited CS-2's vehicle and met with PARKER in PARKER's vehicle. CS-2 then exited PARKER's vehicle and departed the area. CS-2 was followed by surveillance to a post-buy location. Agents subsequently retrieved approximately 25 grams of cocaine from CS-2. CS-2 was again searched for contraband with negative results. CS-2 stated that CS-2 purchased the cocaine from PARKER while in PARKER's vehicle. ATF field-tested the substance and it indicated positive for cocaine. The drug exhibit was not submitted to the DEA laboratory for testing due to the ATF not seeking prosecution of the controlled purchase.

22.     On September 12, 2018, DEA met with CS-3 and obtained approximately 25 grams of cocaine from CS-3. CS-3 related that SIVELS provided the cocaine to CS-3 on consignment on September 11, 2018. On September 13, 2018, DEA met with CS-3 and formulated plans to make a controlled money payment to SIVELS for the cocaine received by CS-3 on September 11, 2018. At that time, CS-3 advised that CS-3 had sent a text message to

11

Jerriod SIVELS at Target Telephone #1.  This message was reviewed by agents on CS-3's cellular telephone and related that CS-3 had the money CS-3 owed and that CS-3 wanted to meet with Jerriod SIVELS.  At approximately 2:35 p.m., CS-3 received an incoming recorded telephone call from Jerriod SIVELS.  During the call, CS-3 stated, "I need to drop this off to you."  Jerriod SIVELS replied, "I'm going to call you as soon as I get out."  Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, CS-3 told Jerriod SIVELS he had money to pay Jerriod SIVELS for the previously received one ounce of cocaine, and Jerriod SIVELS told CS-3, he would call CS-3 soon.  In subsequent recorded and monitored telephone calls between CS-3 and Jerriod SIVELS, Jerriod SIVELS directed CS-3 to meet a third party at a car wash in Chattanooga, Tennessee.  At the direction of law enforcement, CS-3 subsequently met with and paid Anthony POINDEXTER $1,100.00 in pre-recorded DEA funds for the cocaine CS-3 obtained from Jerriod SIVELS on September 11, 2018.  The cocaine was later sent to the DEA laboratory for testing and safekeeping and the lab results showed that the substance was 25.22 net grams of cocaine with a 14% purity.

23.     On October 4, 2018, law enforcement personnel met with CS-3 at a pre-arranged location and formulated plans to make a controlled purchase of one ounce of cocaine from Jerriod SIVELS.  CS-3 subsequently had several recorded and monitored telephone conversations with Jerriod SIVELS in which Jerriod SIVELS agreed to meet with CS-3 to sell CS-3 cocaine.  At the direction of law enforcement, CS-3 later met with Jerriod SIVELS and purchased approximately one ounce of cocaine from Jerriod SIVELS for $1,000.00 U.S. currency.

24.     On November 15, 2018, CS-3 made a recorded telephone call to Jerriod SIVELS at Target Telephone #1.  Your Affiant and DEA Special Agent Andrew Bergren witnessed and monitored this phone call to include the telephone number dialed. During the call, CS-3 related

that CS-3 had been needing Jerriod SIVELS. Jerriod SIVELS advised CS-3 that he had been in "county." Your Affiant is aware that Jerriod SIVELS was incarcerated in the Hamilton County Jail for a probation/parole violation between November 8 and November 13, 2018. CS-3 then told Jerriod SIVELS that he "would be ready tomorrow" and would need "more than usual." Jerriod SIVELS told CS-3 to "call when ready." Based on my training, experience, and knowledge of this investigation, I believe that during this conversation, CS-3 advised Jerriod SIVELS that CS-3 had needed to get additional cocaine from Jerriod SIVELS and Jerriod SIVELS advised that he had been incarcerated. CS-3 then informed Jerriod SIVELS that CS-3 wanted to purchase more than the usual one ounce of cocaine. Jerriod SIVELS then told CS-3 to contact him when CS-3 was ready.

25. On November 16, 2018, CS-3 sent a text message to Jerriod SIVELS on Target Telephone #1 stating, "I'm gonna need 4 and a spit when you get up need it before 2pm I have to get on the high-way by that time get at me." Your Affiant is aware that "4 and spit" is a reference to 4 ½ ounces of cocaine. At approximately 11:50 a.m., CS-3 contacted law enforcement and advised that Jerriod SIVELS had called CS-3 from Target Telephone #1 and they agreed to meet in 45 minutes. At approximately 12:42 p.m., Jerriod SIVELS' vehicle was located at 3506 Hoyt Street, Chattanooga, Tennessee. At that same time, Jamaal PARKER's Chevrolet Silverado bearing Tennessee license plate 5G22P4 was observed parked in front of 3505 Hoyt Street, Chattanooga, Tennessee. Surveillance later observed a subject walk from 3505 Hoyt Street to 3506 Hoyt Street. Shortly thereafter, Jerriod SIVELS' vehicle was observed to depart Hoyt Street. Surveillance of Jerriod SIVELS was lost. At approximately 12:55 p.m., surveillance observed Jerriod SIVELS parked at the arranged meet location. After the meeting, law enforcement met with CS-3 and found that Jerriod SIVELS had only provided CS-3 with

approximately three ounces of cocaine. At the direction of law enforcement, CS-3 contacted

Jerriod SIVELS and arranged to meet him back at the original meet location. CS-3 then returned

to the meet location and received a second bag of cocaine from an uninvolved party that Jerriod

SIVELS had left at the meet location for CS-3. In total, law enforcement recovered

approximately 111 grams of cocaine from CS-3. At approximately 1:22 p.m., CS-3 sent a text

message to Jerriod SIVELS at Target Telephone #1 stating in part, "I'm good fam I got it."

Based on my training, experience, and knowledge of this investigation, I believe that in this text

message, CS-3 told Jerriod SIVELS that he obtained the additional ounce of cocaine Jerriod

SIVELS had left with the third party.

26.     On December 5, 2018, Chattanooga Police Department Officer Dennis Harrison

conducted a traffic stop on a black 2015 Chevrolet Silverado bearing Tennessee license plate

5G22P4, registered to and driven by Jamaal PARKER. Officer Harrison attempted to conduct a

traffic stop on this same vehicle approximately 1 ½ weeks prior and the driver of the vehicle fled

from the traffic stop and was not apprehended. During the traffic stop, Officer Harrison located

approximately $7,559.00 on Jamaal PARKER's person and in the vehicle. Officer Harrison also

found a drug ledger in the vehicle with various names and/or abbreviations with money amounts

written next to them. Two of the ledger entries were "KO" with the number 250 written next to

it and "Bug" with the "500 1000 + 200 written next to it with the numbers 500 and 200 scratched

out. Your Affiant believes that "KO" is a reference to Broderick LAY and "Bug" is a reference

to Lovest CARTER. CARTER is a co-defendant of Jerriod SIVELS and Jamaal PARKER in the

instant investigation. Jamaal PARKER was subsequently released from the traffic stop without

charges.

27.     On January 16, 2019, the DEA formulated plans to make a controlled purchase of cocaine from Jerriod SIVELS.  At approximately 4:35 p.m., CS-3 made a recorded telephone call to Jerriod SIVELS on Target Telephone #1.  During the call, CS-3 stated, "We'll need ya in about 45 minutes" and Jerriod SIVELS responded, "Alright, call me." Based on my training, experience, and knowledge of this investigation, I believe that during this call, CS-3 advised Jerriod SIVELS that CS-3 needed to purchase cocaine and Jerriod SIVELS agreed.  Surveillance was subsequently established at Jerriod SIVELS' residences, located at 207 Gillespie Terrace and at 3505/3506 Hoyt Street, Chattanooga, TN.  At approximately 5:03 p.m., surveillance officers observed Jerriod SIVELS depart Gillespie Terrace in a blue Hyundai SUV bearing license New York license plates JEF9822.  CS-3 then drove to the arranged meet location in Chattanooga, Tennessee.  Surveillance was maintained on CS-3.  At approximately 5:09 p.m., CS-3 called SIVELS and advised CS-3 was "at the house." This call was intercepted pursuant to court-authorized interceptions of Target Telephone #1.  At approximately 5:27 p.m., Jerriod SIVELS was observed by surveillance arriving at 3505 Hoyt Street.  At approximately 5:33 p.m., Jerriod SIVELS was observed departing Hoyt Street.  At approximately 5:38 p.m., surveillance observed Jerriod SIVELS' arrive to the meet location.  At that time, CS-3 walked to Jerriod SIVELS' vehicle and entered the rear of the vehicle.

28.     Law enforcement then met with CS-3 at a pre-arranged location and retrieved approximately 50 grams of cocaine from CS-3.  CS-3 advised that Jerriod SIVELS had a small cooler that he retrieved the cocaine from and when he did, CS-3 observed approximately five to six additional ounces of cocaine in the cooler.  The cocaine was later field-tested and tested positive for cocaine.  The cocaine was subsequently sent to the DEA laboratory for testing and safekeeping and the results are pending.  Based on my training, experience, and knowledge of

15

this investigation, I believe that Jerriod SIVELS obtained the cocaine supplied to CS-3 from 3505 Hoyt Street, Chattanooga, Tennessee.

29.     On January 17, 2019, at approximately 2:07 p.m., Target Telephone #1 received an incoming telephone call from telephone number 470-680-0530, utilized by Darious GARRETT. During the call, GARRETT asked Jerriod SIVELS, "Have you made it out yet?" Jerriod SIVELS replied, "Yeah, I finna come out now." GARRETT then stated, "Alright, yeah, I need, my boy wanted to holla at you." Jerriod SIVELS then stated, "I won't be long bout twenty minutes." Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, GARRETT related that he wanted to meet with Jerriod SIVELS to conduct a drug transaction and that Jerriod SIVELS told GARRETT that he was getting ready to leave his residence and would be at 3505 Hoyt Street, Chattanooga, Tennessee in twenty minutes.

30.     At approximately 2:40 p.m., surveillance officers observed GARRETT arrive and park at 3505 Hoyt Street, Chattanooga, Tennessee. At this same time, law enforcement observed Jerriod SIVELS depart his Gillespie Terrace residence and drive to 3506 Hoyt Street, Chattanooga, Tennessee. Jerriod SIVELS was then observed by surveillance to walk across the street to 3505 Hoyt Street. At approximately 2:48 p.m., law enforcement observed GARRETT depart the residence. Shortly thereafter, a Chattanooga Police Department Officer conducted a traffic stop on GARRETT's vehicle for a window tint violation. A probable cause search of the vehicle was subsequently conducted and resulted in the seizure of 29.6 grams of cocaine, 15 grams of crack cocaine, 2.9 grams of marijuana, and 1.1 grams of suspected MDMA from a camera bag located in the passenger's, Shawanna MURRAY, purse. The cocaine was subsequently field-tested and positive results for cocaine were obtained. The seized narcotics

were subsequently sent to the DEA laboratory for testing and safekeeping and the results are pending. Based on my training, experience, and knowledge of this investigation, I believe that GARRETT met with and obtained the seized cocaine from Jerriod SIVELS at 3505 Hoyt Street, Chattanooga, Tennessee.

31. On January 19, 2019, at approximately 12:31 p.m., Target Telephone #2 made an outgoing telephone call to telephone number 423-682-5099, utilized by Deutrich JAMES JR. During the telephone call, DEUTRICH stated that he was meeting someone on "Shannon." Jerriod SIVELS then asked, "You and little dog?" JAMES JR. replied, "Yeah." Your Affiant has learned through the course of this investigation that JAMES JR. is a distributor of narcotics for Jerriod SIVELS and Jamaal PARKER. Based on my training, experience, and knowledge of this investigation, I believe that when JAMES JR. stated he was meeting someone on "Shannon," he was referring to meeting a drug customer at 617 Shannon Avenue.

32. On January 21, 2019, at approximately 5:50 p.m., Target Telephone #1 made an outgoing telephone call to telephone number 423-800-3408, utilized by an unknown male. During the telephone call, Jerriod SIVELS asked, "What's up dude? Where you at?" The unknown male replied, "On the block." Jerriod SIVELS replied, "Alright." At approximately 7:10 p.m., Target Telephone #1 received an incoming call from telephone number 423-800-3408, utilized by an unknown male. During the telephone call, the unknown male stated, "Hey kin folk. I need that plus two." At approximately 7:56 p.m., Target Telephone #1 received an incoming telephone call from telephone number 423-800-3408, utilized by an unknown male. During the call, the unknown male stated, "Hey I'm here, at right here." Jerriod SIVELS replied, "You over there?" and "Okay here I come." Based on my training, experience, and knowledge of this investigation, I believe that during these telephone calls, Jerriod SIVELS and an unknown

male discussed meeting at 3505 Hoyt Street, Chattanooga, Tennessee to conduct a drug transaction for cocaine.

33.     At approximately 8:15 p.m., surveillance officers observed a green colored Dodge Charger park in front of the driveway at 3505 Hoyt Street. Jamaal PARKER's Chevrolet Silverado pick-up truck was observed in the driveway of 3505 Hoyt Street at this same time. Shortly thereafter, an unknown male could be observed walking back to the vehicle from 3505 Hoyt Street and departing. Surveillance was maintained on the vehicle. At approximately 8:26 p.m., a Chattanooga Police Department officer initiated a traffic stop on the vehicle. As the vehicle fled from the traffic stop, the officer observed items being tossed out of the vehicle. The officer subsequently stopped and recovered approximately 57.2 grams of cocaine, 84.8 grams of crack cocaine, and 38.9 grams of marijuana from the area in which the officer observed the items discarded. The driver of this vehicle was later identified as Deonta BANKS. The crack cocaine and cocaine were subsequently field-tested and indicated positive for cocaine. The seized items were subsequently sent to the DEA laboratory for testing and safekeeping and the results are pending. Based on my training, experience, and knowledge of this investigation, I believe BANKS met with and purchased cocaine from Jerriod SIVELS at 3505 Hoyt Street, Chattanooga, Tennessee prior to the above detailed traffic stop.

34.     On February 6, 2019, at approximately 3:08 p.m., Target Telephone #2, utilized by Jerriod SIVELS, received an incoming telephone call from Target Telephone #3, utilized by Jamaal PARKER. During the call, Jamaal PARKER stated, "Twan and Unc want to come, want to know if you can talk to them." Jerriod SIVELS replied, "I can't hear you." Jamaal PARKER then stated, "Twan, Big and Twan want you know, can he come talk to you." Jerriod SIVELS replied, "Yeah, tell them to come on." Jamaal PARKER then tells Jerriod SIVELS that "Unc is

18

in a blue car." Jamaal PARKER later identifies "Unc" as "J Rock." Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, Jamaal PARKER was sending two drug customers to Jerriod SIVELS.

35. On February 6, 2019, at approximately 5:00 p.m., Target Telephone #2 received an incoming telephone call from Target Telephone #3. During the telephone call, Jamaal PARKER stated, "Somebody done broke into that silver car up there." Jerriod SIVELS replied, "For real?" Jamaal PARKER then stated, "Yeah, go check it out." Based on my training, experience, and knowledge of this investigation, I believe that during this call Jamaal PARKER told Jerriod SIVELS that a vehicle had been broken into. I further believe that based on the below detailed telephone calls, that Jerriod SIVELS and Jamaal PARKER stored firearms and narcotics in this vehicle.

36. At approximately 5:06 p.m., Jerriod SIVELS was observed via a pole camera to walk from 3505 Hoyt Street to 3506 Hoyt Street, Chattanooga, Tennessee. Jerriod SIVELS then departed the area in his vehicle. Jerriod SIVELS was observed via the pole camera to return to 3505 Hoyt Street at approximately 5:15 p.m.

37. At approximately 5:14 p.m., Target Telephone #2 made an outgoing telephone call to telephone number 423-682-5099, utilized by JAMES JR. During the telephone call, Jerriod SIVELS stated, "I'm talking about the stick bro." JAMES JR. replied, "Oh, it was in the trunk, all of it was in the trunk." Jerriod SIVELS replied, "Alright, somebody done broke into this car up here man." JAMES JR. later stated, "they grey car in the yard." Jerriod SIVELS replied, "Y'all niggas slow as shit man." Based on my training, experience, and knowledge of this investigation, I believe that during this conversation, Jerriod SIVELS asked JAMES JR.

about a rifle.  JAMES JR. then told Jerriod SIVELS that the firearm was in the trunk of the grey vehicle parked in the yard.

38.     At approximately 5:19 p.m., Target Telephone #1 made an outgoing telephone call to telephone number 423-505-9022, utilized by Anthony POINDEXTER.  During the telephone call, Jerriod SIVELS stated, "I'm talking about them shoes, about them shoes we had got from Gucci."  POINDEXTER replied, "Huh?"  Jerriod SIVELS then stated, "Ask bruh about them shoes we had got from Gucci.  Ask him where them shoes were at, we had got from Gucci."  POINDEXTER is then heard talking to another party stating, "Where those shoes y'all got from Gucci?"  POINDEXTER then replied to Jerriod SIVELS and stated, "Oh shit, it might been in there to then."  During surveillance on January 6, 2019, at approximately 3:16 p.m., Jamaal PARKER and POINDEXTER were observed traveling southbound on Interstate 75 towards Atlanta, Georgia.  This coincided with other intercepted communications that Jamaal PARKER and POINDEXTER were traveling to Atlanta, Georgia to get Jerriod SIVELS' vehicle repaired.  Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, Jerriod SIVELS asked POINDEXTER about drugs they obtained from "Gucci," known to be Damien DAVENPORT.  DAVENPORT was previously identified in this affidavit as Jerriod SIVELS' and Jamaal PARKER's marijuana source of supply.  After speaking to Jamaal PARKER, POINDEXTER then told Jerriod SIVELS that the drugs may have been in the vehicle that was broken into also.  During the course of authorized interceptions of Target Telephone #1, Target Telephone #2, and Target Telephone #4, Jerriod SIVELS has referred to narcotics as "shoes" on several occasions.

39.     At approximately 6:18 p.m., surveillance officers located a grey vehicle bearing Tennessee license plates R7048M parked in the yard of 617 Shannon Avenue, Chattanooga,

Tennessee.  The vehicle had a broken window and is registered to Esmanda Sparks of 228 Carriage Parc Drive, Chattanooga, Tennessee.  Esmanda Sparks in the known paramour of Jamaal PARKER.  Jamaal PARKER is also the known owner of 617 Shannon Avenue.

40.     At approximately 7:28 p.m., Target Telephone #2 received an incoming telephone call from telephone number 423-682-5099, utilized by Deutrich JAMES JR.  During the telephone call, JAMES JR. asked, "You want us to leave the shit?"  Jerriod SIVELS replied, "I've got to find somewhere to put it first bruh."  JAMES JR. then stated, "I know but me and KG just left down there so shit we on our way back to the spot."  Jerriod SIVELS then asked, "So y'all grabbed shit anyway?"  Jerriod SIVELS later stated, "Y'all bitches didn't even know anything about it.  You know I've been up there to check if I called y'all niggas and told y'all somebody did the shit."  Jerriod SIVELS later stated, "Don't bring that shit down here bruh. Nigga ain't trying to do two hundred years federal time."  JAMES JR. then stated, "Just gonna put it up under K-Round."  Jerriod SIVELS replied, "That ain't gonna be no good up under there bruh.  Is they closed in down there?"  JAMES JR. replied, "Yeah it's closed in.  It ain't gonna get wet for shit."  Based on my training, experience, and knowledge of this investigation, I believe that during this conversation, Jerriod SIVELS and JAMES JR. discussed where to store drugs that JAMES JR. had in his possession because the vehicle where they stored those items had been broken into.  Jerriod SIVELS then told them to not bring the drugs to his residence because he did not want to serve 200 years in federal prison.  JAMES JR. then told Jerriod SIVELS that they were going to put somewhere where it would not get wet.

41.     At approximately 7:44 p.m., Target Telephone #2 received an incoming telephone call from telephone number 423-682-5099, utilized by JAMES JR.  During the telephone call, JAMES JR. stated, "I was on Shannon to put that shit up."  Jerriod SIVELS replied, "What y'all

need to get in the house or something?" JAMES JR. then stated, "Yeah, hell yeah." Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, JAMES JR. informed Jerriod SIVELS that they stored the narcotics they had at 617 Shannon Avenue, a property owned by Jamaal PARKER.

42. On February 16, 2019, law enforcement conducted surveillance on Jerriod SIVELS and Jamaal PARKER subsequent to intercepted communications on February 15, 2019, which indicated that Jerriod SIVELS would be meeting with his cocaine source of supply the following day. At approximately 10:05 a.m., Jerriod SIVELS was observed by surveillance to arrive to 3505 Hoyt Street, Chattanooga, Tennessee. At approximately 11:10 a.m., camera surveillance showed Jerriod SIVELS depart Hoyt Street. Surveillance was maintained on Jerriod SIVELS. At approximately 11:34 a.m., Jerriod SIVELS was observed parking at the known residence of Jamaal PARKER. At approximately 12:35 p.m., Jerriod SIVELS and Jamaal PARKER were observed to depart the residence and surveillance was maintained on both subjects. Jerriod SIVELS and Jamaal PARKER were later observed at 207 Gillespie Terrace, Chattanooga, Tennessee and then back at 3505 Hoyt Street, Chattanooga, Tennessee. At approximately 2:36 p.m., Jamaal PARKER's vehicle was observed leaving 3505 Hoyt Street, Chattanooga, Tennessee. Both Jamaal PARKER and Jerriod SIVELS were occupants of the vehicle. The vehicle was then followed by surveillance to Anthony POINDEXTER's residence in Chattanooga, Tennessee. At approximately 3:02 p.m., Jamaal PARKER and Jerriod SIVELS departed the residence in Jamaal PARKER's vehicle and POINDEXTER departed in his vehicle. Surveillance was maintained on both vehicles. At approximately 4:55 p.m., law enforcement determined that both vehicles were at a residence in Atlanta, Georgia. At approximately 5:18 p.m., both vehicles departed the Atlanta residence.

43.     At approximately 5:52 p.m., Georgia State Police (GSP) officers initiated a traffic stop on POINDEXTER for traffic violations.  At approximately 5:53 p.m., Target Telephone #2 received an incoming telephone call from POINDEXTER.  During the call, POINDEXTER stated, "Hey, they just pulled me over man. Bartow County man."  Jerriod SIVELS replied, "For real?"  POINDEXTER then stated, "Yeah, yeah man" and Jerriod SIVELS replied, "God damn."  A subsequent probable cause search of POINDEXTER's vehicle resulted in the seizure of approximately eight kilograms of cocaine from a black gym bag located on the rear seat of the vehicle.  POINDEXTER was subsequently arrested and transported to the Bartow County jail.  The cocaine was later field-tested and it tested positive for cocaine.  The cocaine was subsequently sent to the DEA laboratory for testing and safekeeping and the results are pending.

44.     On February 21, 2019, Target Telephone #3, utilized by Jamaal PARKER, received an incoming telephone call from telephone number 404-661-2514, utilized by an unknown male.  During the telephone call, Jamaal PARKER stated, "But look bro, we just took a, we took a major loss bro.  You hear me but we still alright."  Jamaal PARKER later stated, "Look we just took a major loss but we still going push this shit."  Based on my training, experience, and knowledge of this investigation, I believe that during this call, Jamaal PARKER told the unknown male that although they took a "major loss," referring to the seizure of eight kilograms from Anthony POINDEXTER on February 19, 2019, they were still conducting business.

45.     On March 2, 2019, at approximately 1:55 p.m., Target Telephone #2 made an outgoing telephone call to telephone number 404-210-1938, utilized by Nathaniel WILKINS, Jerriod SIVELS' and Jamaal PARKER's cocaine source of supply.  During the telephone call, Jerriod SIVELS stated, "Shit, umm you around?" and "I'm trying to come see you

23

today." WILKINS replied, "Shit, what you, what you talking about? Just text me then I'll let you know," and "You got, you got, you got that other thing for me?" Jerriod SIVELS replied, "Man, them mother fuckers wasn't even right man," and "Hell no, hell no, I'm going to get my money back." WILKINS then stated, "Aight, you got to let me know cause I'm kind of low on our end, I'm low." SIVELS answered, "Uh, shit shit, shit, shit, shit, shit, shit, Aight I'm fixin, uh, I'm fixin to figure this shit out. I'm fixin to hit you right back." WILKINS stated again, "I'm telling you I'm low," and SIVELS replied, "Aight, that's what I'm sayin. I'm fixin uh, I'm coming through, I'm fixin to come through." Based on my training, experience, and knowledge of this investigation, I believe that during this call, WILKINS told Jerriod SIVELS he was low on cocaine, and Jerriod SIVELS stated that he was coming to see WILKINS.

46.     At approximately 1:57 p.m., Target Telephone #2 made an outgoing phone call to telephone number 404-210-1938, utilized by WILKINS. During the call, SIVELS stated, "Trying to see if you'll stop by the liquor store and grab me like three bottles of Hennessey." WILKINS replied, "Is that what you want?" and "What you want, the big bottles?" SIVELS replied, "Yeah, the big bottles of Hennessey." WILKINS then stated, "Aight." Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, Jerriod SIVELS referred to cocaine in coded language as "bottles of Hennessey" and relayed to WILKINS that he wanted three kilograms of cocaine.

47.     At approximately 2:45 p.m., surveillance already established at 207 Gillespie Terrace, Chattanooga, Tennessee observed Jerriod SIVELS and Jamaal PARKER depart the residence. Surveillance was maintained on Jamaal PARKER. Jamaal PARKER was later followed to his residence located at 228 Carriage Parc Drive, Chattanooga, Tennessee and then

to southbound Interstate 75. Jamaal PARKER was driving a black Chevrolet Silverado 2500 bearing Tennessee license plate 5G22P4.

48.     At approximately 5:27 p.m., Jamaal PARKER received an incoming telephone call on Target Telephone #3 from Jerriod SIVELS on Target Telephone #2. During their conversation, Jerriod SIVELS advised, "Yeah, my phone on silent. Whatcha doing?" Jamaal PARKER replied, "Getting on the road." Jerriod SIVELS then stated, "Alright, dude had just called," and Jamaal PARKER replied, "You gonna call him? I'm in Rome?" Jerriod SIVELS then stated, "Alright, just give him a call when ya get closer." Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call, Jerriod SIVELS told Jamaal PARKER to contact WILKINS when he got close to WILKINS' residence.

49.     At approximately 6:32 p.m., Jamaal PARKER's vehicle was observed parked at a residence in Atlanta, Georgia. At approximately 6:40 p.m., Jamaal PARKER departed the residence and surveillance was maintained on his vehicle.

50.     At approximately 10:08 p.m., a Georgia State Patrol trooper initiated a traffic stop on Jamaal PARKER's vehicle on Interstate 75 North near mile marker 293. Jamaal PARKER initially stopped his vehicle along the right hand shoulder of the roadway and then fled from law enforcement in his vehicle. Georgia State Patrol troopers pursued Jamaal PARKER North on Interstate 75. Georgia State Patrol executed a P.I.T. maneuver of Jamaal PARKER's vehicle in an attempt to stop Jamaal PARKER. Jamaal PARKER crashed his vehicle into a guardrail along the right hand shoulder of the northbound side of Interstate 75. Jamaal PARKER exited the vehicle carrying a dark backpack and took flight on foot across the north and southbound lanes of Interstate 75. DEA Atlanta agents and members of the Georgia State Patrol pursued Jamaal PARKER. Jamaal PARKER was apprehended on the southbound right hand shoulder of the

roadway.  Jamaal PARKER was carrying the dark backpack.  A DEA Atlanta agent recovered the backpack from Jamaal PARKER and conducted a search incident to arrest.  Inside the backpack, the DEA Atlanta agent located four, one-kilogram rectangular packages of cocaine.  A probable cause search of the vehicle lead to the discovery of a Springfield XD handgun in the driver side floorboard.  Based on my training, experience, and knowledge of this investigation, I believe that Jamaal PARKER obtained the four kilograms of cocaine from WILKINS while in Atlanta, Georgia.

51.     On March 3, 2019, at approximately 12:50 a.m., Jerriod SIVELS was arrested in Chattanooga, Tennessee.  At the time of his arrest, a firearm and miscellaneous documents were seized from Jerriod SIVELS and his vehicle.  The documents included a drug ledger with various initials and names with numeric values written next to the names.

52.     On March 3, 2019, a federal search warrant was executed at 3505 Hoyt Street, Chattanooga, Tennessee.  The search warrant resulted in the seizure of cocaine, crack cocaine, Promethazine, and a hydraulic press with kilogram molds.  Also located in the residence were miscellaneous items consistent with the processing and packaging of narcotics.  These items included numerous digital scales, Pyrex glassware with suspected cocaine residue, numerous boxes of baking soda, Inositol, razor blades with white residue, and filtering masks.   Based on my training, experience, and knowledge of this investigation, I believe that items seized and located at 3505 Hoyt Street, Chattanooga, Tennessee, the subject residence was being utilized by Jerriod SIVELS and Jamaal PARKER to store, process, and distribute cocaine, marijuana, and other controlled substances.

53.     In March 2019, a cooperating defendant, hereinafter CD-2, was interviewed by DEA.  A substantial portion of the information provided by CD-2 was corroborated by

independent investigation, including physical surveillance, the review of DEA and ATF documents as well as other federal, state, and local documents, interviews of other members of the above-stated drug trafficking organization, controlled purchases of narcotics, and court-authorized interception of wire and electronic communications. During the interview, CD-2 stated that CD-2 knew Jerriod SIVELS and Jamaal PARKER for approximately ten years. CD-2 did not know Jerriod SIVELS or Jamaal PARKER to have employment during that period. CD-2 advised that CD-2 was a cocaine user and was frequently supplied user quantities cocaine from Jerriod SIVELS and from members of Jerriod SIVELS' drug organization. CD-2 stated that CD-2 brokered cocaine transactions between several customers that CD-2 knew and Jerriod SIVELS. CD-2 stated that CD-2 would frequently collect drug debts from these persons for Jerriod SIVELS. CD-2 further stated that Jerriod SIVELS and Jamaal PARKER previously distributed cocaine from 617 Shannon Avenue, Chattanooga, Tennessee but began distributing from 3505 Hoyt Street, Chattanooga, Tennessee shortly after Jerriod SIVELS acquired the property.

54. An Indictment was filed on March 26, 2019 in the Eastern District of Tennessee, charging Jerriod SIVELS, Jamaal PARKER, and others with conspiracy to distribute and possess five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B). On April 23, 2019, a Superseding Indictment was filed in the Eastern District of Tennessee, charging violations of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), 841(b)(1)(C), 856(a)(1) and 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2, among other violations. The Superseding Indictment included forfeiture allegations of the subject property pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 982(a)(1).

55.     Your Affiant is not aware of Jamaal T. PARKER having any legitimate employment.  Your Affiant is further aware that after Jamaal T. PARKER'S arrest, he submitted a financial affidavit to the court which indicated Jamaal T. PARKER was not employed.

56.     Your Affiant requested Jamaal PARKER's tax returns for the years of 2015 through 2018 and no returns were filed during that time period.

57.     Jamaal Tyrone PARKER, with a listed address of 614 Carriage Parc Drive, Chattanooga, TN 37421 purchased 617 Shannon Avenue for $15,000.00 on July 25, 2016. According to the title history for 617 Shannon Avenue, there was no Deed of Trust or mortgage lien recorded against PARKER in connection with the purchase of the property.

58.     Jamaal T. PARKER, with a listed address of 634 Carriage Parc Drive, Chattanooga, TN 37421, purchased 508 Menlo Street for $9,000.00 on November 12, 2016. According to the title history for 508 Menlo Street, there was no Deed of Trust or mortgage lien recorded against PARKER in connection with the purchase of the property.

59.     Through the course of this investigation, the DEA has learned that Jerriod SIVELS and Jamaal PARKER have been involved in the distribution of cocaine, marijuana, and other controlled substances since at least 2014.  Jerriod SIVELS only known source of legitimate income is through rental properties owned by Jerriod SIVELS at 3604 and 3606 3rd Avenue, Chattanooga, Tennessee.   Jamaal PARKER has no known source of legitimate income. Information obtained through surveillance, controlled purchases of narcotics, interviews of cooperating sources and cooperating defendants, and court-authorized wiretaps has shown that Jerriod SIVELS and Jamaal PARKER's primary source of income has been through the sale of narcotics and that the subject properties were purchased during the course of the charged drug conspiracy.

## CONCLUSION

60.     The subject properties constitute facilitating property and/or are derived from proceeds traceable to violations of property derived from proceeds traceable to violations of 21 U.S.C. §§ 841 (Drug Distribution) and/or 846 (Drug Conspiracy) and are subject to civil forfeiture pursuant to 21 U.S.C. §§ 881(a)(6) and 881(a)(7), and pursuant to 18 U.S.C. §§ 1956 and/or 1957 (Money Laundering) and are subject to civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

All of the above information is true and correct to the best of my knowledge.

FURTHER, YOUR AFFIANT SAYETH NOT.

_____
William C. Wise
Special Agent
Drug Enforcement Administration

STATE OF TENNESSEE

COUNTY OF HAMILTON

On this _13th_ day of May, 2019, before me, personally appeared William C. Wise, in his capacity as a Special Agent with the Drug Enforcement Administration, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.

Subscribed to and sworn before me on this this _13th_ day of May, 2019.

_____
NOTARY PUBLIC

My Commission Expires: _11-26-22_